UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Shepaug Realty, LLC,                    :
        Plaintiff,                      :
                                        :
v.                                      :    Case No. 3:05cv628 (JBA)
                                        :
Stephanie Ingrassia,                    :
        Defendant.                      :

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 52]**

Plaintiff Shepaug Realty, LLC ("Shepaug") instituted this action against Stephanie Ingrassia ("Ingrassia") claiming breach of contract and unjust enrichment as a result of defendant's purchase of a parcel of undeveloped land owned by Regine Laverge (the "Laverge Property") allegedly in breach of a July 16, 2003 agreement (the "July Agreement," [Doc. # 54, Ex. D]) in which defendant agreed, inter alia, that she would not engage in negotiations directly with Ms. Laverge and in exchange Shepaug would act in good faith to procure the Laverge Property for defendant. See Second Am. Compl. [Doc. # 32]. In her responsive pleading defendant asserted two counterclaims – one for breach of contract, alleging plaintiff's failure to comply with its obligation to act in good faith to procure the Laverge Property for defendant, and one alleging a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). See Am. Answer [Doc. # 45] at 4-6. The dispute arises in connection with the negotiations and eventual agreement between the parties that Shepaug would

1

sell to Ingrassia a parcel of property owned by Shepaug (the "Shepaug Property") that abutted the Laverge Property, which agreement culminated in a Real Estate Contract and documents incorporated thereto, signed on August 8, 2003 (the "August Agreement," [Doc. # 54, Ex. C]).

Defendant Ingrassia now moves for summary judgment on grounds that: (1) the August Agreement supplanted the July Agreement as the only contract between the parties; (2) the July Agreement is unenforceable as a matter of public policy because it constitutes an unlawful restraint of trade; and (3) even if the July Agreement is valid and operative, Shepaug cannot enforce it against Ingrassia because Shepaug breached that agreement by failing to act in good faith to procure the Laverge Property for her. See Mot. for Summary Judgment [Doc. # 52]. Defendant also seeks summary judgment on her counterclaim for breach of contract, on the same basis articulated in (3) above. See id. Shepaug opposes summary judgment, contending that the August Agreement did not supplant the July Agreement because the two agreements did not concern the same subject matter and the terms of the July Agreement do not conflict with the terms of the August Agreement, that the July Agreement is not an unlawful restraint of trade, and that Shepaug met its obligation to act in good faith to procure the Laverge Property for defendant, up until the time when defendant purchased the property from Ms.

2

Laverge directly.  See Pl. Opp. [Doc. # 58].  For the reasons
that follow, defendant's motion as to plaintiff's Second Amended
Complaint will be granted.

## I.  Factual Background

The record establishes the following facts, which are
undisputed unless otherwise noted.  Plaintiff Shepaug is a
Connecticut company that is in the business of buying,
developing, and selling land.  Farmer Dep. [Doc. # 54, Ex. A] at
25-28.  Plaintiff acquired the Shepaug property, which abutted
the Laverge Property, in November or December of 2002.  Id. at
25.

On July 16, 2003, defendant Ingrassia met Mark DePecol, a
representative of Shepaug, at the Shepaug Property because
Ingrassia was interested in purchasing the property.  DePecol
Dep. [Doc. # 54, Ex. B] at 49-50.  "As soon as [Ingrassia]
stepped out of the car," id., Depecol had Ingrassia sign the July
Agreement, which provides:

> Stephanie Ingrassia is aware that Shepaug Realty, LLC
> is negotiating a joint venture with Ine Laverge which
> involves the development of her property utilizing a
> right of way over Shepaug Realty's land and future
> bridges.
>
> Stephanie Ingrassia is interested in purchasing Shepaug
> Realty's 40 acre parcel and acknowledges a right of way
> to the Laverge property which will give convenient
> access to the property which consists of 26 acres and
> may contain two building lots.
>
> Stephanie Ingrassia, her affiliates, agents or assigns,
> agrees not to enter into negotiations with Ine Laverge,

3

her affiliates, agents or assigns for the purpose of
purchasing 26 +/- acres abutting Shepaug Realty's 40
acres.

In return, should Stephanie Ingrassia purchase the 40
acres, Shepaug Realty grants the above first right of
refusal to the proposed right of way over Shepaug
Realty's property and will act in good faith to procure
the 26 acres for Stephanie Ingrassia.

Stephanie Ingrassia hereby acknowledges Mark DePecol
introduced her to the Laverge property and was the
procuring party in this transaction on 7-15-03.
This agreement shall be in effect for 24 months from
this date.

July Agreement [Doc. # 54, Ex. D].  The July Agreement, <u>inter</u>
<u>alia</u>, reflected the fact that, in the event of a sale of the
Shepaug Property, Shepaug intended to reserve to itself a right
of way over the property to access the Laverge Property using a
bridge.  Farmer Dep. at 146-47.  DePecol testified that he
"explained to [Ingrassia] what she would be signing if she wanted
to purchase the property.  It was a condition of purchasing the
property.  I had to let her know that there would be other cars
going over the road, the bridge" and "in addition to that, yes,
plus, also, that we were negotiating to purchase the property
[because] [DePecol] didn't want [Ingrassia] to get in the middle
of [his] negotiations for the adjoining property."  DePecol Dep.
at 51-52.  DePecol further testified that "the terms contained in
[the July Agreement] [were] important to the transaction between
Shepaug and Ingrassia with respect to the sale of [the Shepaug
Property]" and "from [his] perspective, part and parcel of the

sale of [the Shepaug Property] from Shepaug to the Ingrassias included the terms outlined in [the July Agreement]." Id. at 56. Similarly, a member of Shepaug, Philip Farmer, testified that the agreement that Shepaug "had full rights to negotiate with Ine [Laverge] [and] they would not interfere with those rights" was "of critical importance" to Shepaug.  Farmer Dep. at 140. Ingrassia testified that although she considered the July Agreement to be "an agreement," "this was the beginning of discussions that led to a contract [and] at the August closing for the Shepaug property, in [her] mind, this July 16, 2003 agreement was no longer effective."  Ingrassia Dep [Doc. # 58-5] at 50.

In the course of walking the Shepaug Property on July 16, 2003, Ingrassia and DePecol also walked the Laverge Property and Ingrassia indicated that she wanted to purchase the Laverge Property as well as the Shepaug Property.  DePecol Dep. at 59. At the time, as reflected by the July Agreement, Shepaug had no ownership interest in the Laverge Property nor any commitment from Ms. Laverge that she would sell the property to Shepaug. Id.  In any event, the parties proceeded to engage in negotiations for the closing on the purchase/sale of the Shepaug Property.  On July 17, 2003, the parties entered into a Purchase Agreement for the Shepaug Property which included, inter alia, a purchase price of $1.2 million, a clause providing that "seller

agrees to install permanent bridge with aesthetic input of buyer," and a provision stating "subject to a right of 1st refusal of the adjoining property which shares bridge belonging to Ine LaVerge."  7/17/03 Agmt. [Doc. # 54, Ex. E].  The July 17 agreement did not mention Ingrassia's ability to communicate/negotiate with Ms. Laverge concerning purchase of the Laverge Property, nor did it provide an obligation on the part of Shepaug to act in good faith to obtain the Laverge Property for Ingrassia.

As negotiations continued, on July 18, 2003 Shepaug's counsel sent Ingrassia's counsel a draft contract [Doc. # 54, Ex. G], and on July 24, 2004, Ingrassia's counsel transmitted to Shepaug's counsel a draft "addendum" to the draft [Doc. # 54, Ex. H].  The July 18 draft contained a clause providing "In the event Shepaug Realty LLC and Regine LaVerge enter into a Joint Venture Agreement regarding the adjacent property, buyers shall have a Right of First Refusal to the LaVerge property, including the Right of Way" as well as a provision stating "COMPLETE AGREEMENT. It is understood and agreed that this written Agreement (including Schedule A and any other schedule or schedules attached hereto) constitutes the entire contract between the parties hereto, and that no oral statements or contract promises or understanding not embodied in this writing shall be valid." 7/18/03 Draft Contract ¶¶ 15.2, 16.  The July 24 Addendum

6

provided additional details concerning the right of way and right of first refusal.  7/24/03 Addendum ¶¶ 3-4.  Neither draft mentioned any prohibition on Ingrassia's right to discuss/negotiate with Ms. Laverge concerning the LaVerge Property nor any obligation on the part of Shepaug to act in good faith to procure the LaVerge Property for Ingrassia.

On August 2, 2003, Mr. Farmer and Mr. DePecol of Shepaug met with Ingrassia and her husband to "clarify the terms and conditions of the transaction." DePecol Dep. at 68.  Farmer and DePecol presented the Ingrassias with a typewritten document DePecol had prepared [Doc. # 54, Ex. I]; DePecol testified that the document outlined issues which "were discussed because they hadn't been clarified" and that he "left that meeting with some of those issues clarified."  DePecol Dep. at 70.  DePecol's document stated, <u>inter</u> <u>alia</u>, "**Protection** . . . Potential ways to lose our protection: . . . 2. Buyer of 40 acres could negotiate directly with [LaVerge] to buy in future," "This translates into the following language: . . . Buyer agrees not to negotiate with LaVerge." 8/2/03 Document.  DePecol and Farmer both testified that the Ingrassias' ability to negotiate with LaVerge was discussed by the parties at the August 2, 2003 meeting.  DePecol Dep. at 76; Farmer Dep. at 102.  During this meeting, Farmer and Mr. Ingrassia initialed a one-page handwritten document, which provided:

> 1) Shepaug Realty will have a right of way easement for a period of twenty years (20) that will be recorded. <u>Benefits of said easement will be transferable only after property goes through ROFR as described in point 2 below.</u> The Ingrassia's [sic] will have the right to buy back the ROW easement for $1.00 after a period of two years following the closing on the 40 acres.
>
> 2) The Ingrassias will have a right of first refusal of Ine Laverge's property should Shepaug Realty gain control of the property.
>
> 3) The Ingrassias will only reveal to Ine Laverge or her agents or heirs that they have an agreements of Right of 1st Refusal with Shepaug Realty should they be approached.

8/2/03 Handwritten Document [Doc. # 54, Ex. J].  With the exception of the underlined sentence, the document was written in Mr. Farmer's handwriting.  Farmer Dep. at 113-14.

The parties continued to negotiate the terms and conditions of the sale/purchase of the Shepaug Property up until the date of closing.  Ultimately, on August 8, 2003, the parties entered into the August Agreement – a "Real Estate Contract" with Attached "Schedule 'A'" and "Addendum."  The August Agreement provided, <u>inter</u> <u>alia</u>, that the Shepaug Property would "be subject to an Easement for ingress and egress to the adjacent property now owned by Regine LaVerge as provided in the Addendum attached hereto," August Agreement ¶ 5, which Addendum stated that the right of way would not become effective or run with the land unless Shepaug acquired the LaVerge Property, that the right of way "shall expire and be of no further force and effect should

[Shepaug] not become the owner of said adjoining property within 2 years of closing," as well as providing details about the specific nature of the right of way, Addendum ¶ 3(a)-(c). Schedule "A" to the August Agreement further provided that the right of way would be limited "solely for use to serve the [LaVerge Property] in a manner consistent with a single family residence and lawful appurtenant uses."  Mr. Farmer testified that they agreed to make the change from the initial proposal concerning two potential lots on the LaVerge Property to only one single family residence lot "to keep negotiations on track." Farmer Dep. at 91.  The August Agreement also contained provisions concerning the right of first refusal granted to defendant, should Shepaug acquire the LaVerge Property, see August Agreement Addendum ¶ 4, including a clause stating that "the Purchaser shall not discuss their first refusal rights to the Laverge Property with anyone other than their own professional advisors or the Seller," the continuation of that phrase providing "or Ine Laverge or her agents or heirs" was deleted by handwritten markings of the parties, id. ¶ 5.  The August Agreement contained no clause restricting defendant from negotiating directly with Ms. LaVerge concerning purchase of her property.  See also Farmer Dep. at 127 ("Q. Nowhere in the real estate contract and its addendum . . . does it mention a restriction on the Ingrassias to negotiate with Ine LaVerge for

the adjacent property; isn't that correct?  A. Not specifically.").  Lastly, the August Agreement contained a "Complete Agreement" provision, stating "It is understood and agreed that this written Agreement (including Schedule A and any other schedule or schedules attached hereto) constitutes the entire agreement between the parties hereto, and that no oral statements or contract promises or understanding not embodied in this writing shall be valid."  August Agreement ¶ 16.

The parties dispute what occurred after the closing on August 8, 2003.  Defendant contends that Shepaug never attempted to purchase the LaVerge Property for her, citing to deposition testimony of Mr. DePecol that he "was very involved with procuring the property, not for Stephanie [Ingrassia] but for us."  DePecol Dep. at 86.  By contrast, Shepaug claims that after the closing on the Shepaug Property, Ingrassia and Mr. DePecol discussed on multiple occasions "the progress of [Shepaug's] negotiations" with Ms. LaVerge, up until a point where the deal "went dead" as a result of Ingrassia's direct transaction with Ms. LaVerge.  See id. at 91-94; Farmer Dep. at 129-33, 148. Ingrassia began negotiating with Ms. LaVerge sometime in the Spring of 2004 concerning purchase of the LaVerge Property, and Ingrassia ultimately purchased approximately 20 acres of the LaVerge Property from Ms. LaVerge on September 15, 2004.  See Warranty Deed [Doc. # 54, Ex. K].

## II.  Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Id. (citations omitted).  "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).  However, "[w]here

11

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her

12

favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  Matsushita, 475 U.S. at 586 (citations omitted).

## III. Discussion

Defendant claims that the August Agreement supplanted the July Agreement because it related to the sale of the Shepaug Property and the conditions placed on that sale relating to the LaVerge Property and Shepaug's and/or Ingrassia's potential future acquisition of that property, but did not reiterate the obligation in the July Agreement that Ingrassia not negotiate directly with Ms. LaVerge and also contained some terms inconsistent with those in the July Agreement, particularly in light of the "Complete Agreement" clause in the August Agreement. Plaintiff disputes defendant's contentions and argues that the July Agreement survived the execution of the August Agreement because the two agreements concerned different subject matters.

13

The general rule from the Restatement (First) of Contracts §
240 ("In What Cases Integration Does Not Affect Prior Or
Contemporaneous Agreements") is as follows:

> (1) An oral agreement is not superseded or invalidated
> by a subsequent or contemporaneous integration, nor a
> written agreement by a subsequent integration relating
> to the same subject-matter, if the agreement is not
> inconsistent with the integrated contract, and

> (a) is made for separate consideration, or

> (b) is such an agreement as might naturally be made as
> a separate agreement by parties situated as were the
> parties to the written contract.

Accord 11 Williston on Contracts § 33:28 (also stating, "[t]he
justification of the Parole Evidence Rule is that when parties
incorporate an agreement in a writing it is a reasonable
assumption that everything included the bargain is set down in
writing.  Though this assumption in most cases conforms to the
facts, and the certainty attained by making the rule a general
one affords grounds for its existence, there are cases where it
is so natural to make a separate agreement, frequently oral, in
regard to the same subject-matter, that the Parole Evidence Rule
does not deny effect to the collateral agreement").

The Connecticut Supreme Court has stated "[a]s a general
rule, when the new contract is in regard to the same matter and
has the same scope as the earlier contract and the terms of the
two are inconsistent either in whole or in a substantial part, so
that they cannot subsist together, the new contract abrogates the

14

earlier one in toto and takes its place, even though there is no express agreement that the new contract shall have that effect." Riverside Coal Co. v. American Coal Co., 107 Conn. 40, 139 A. 276, 278 (Conn. 1927).  The Connecticut Supreme Court has "long . . . held that when [parties to a contract] have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing."  Tallmadge Bros., Inc. v. Iroquois Gas Transmissions Sys., L.P., 252 Conn. 479, 502 (Conn. 2000); accord Harris v. Clinton, 142 Conn. 204, 210 (Conn. 1955) ("[W]hen parties have merged all prior negotiations and agreements in a writing, intending to make that the repository of their final understanding, evidence of such prior negotiations and agreements will not be received to vary or add to the writing.  If, however, it appears that a collateral agreement not contained in the written agreement was entered into contemporaneously therewith, it may be proved by parol.").

However, "[i]n order for th[is] bar against the introduction of extrinsic evidence to apply, the writing at issue must be integrated, that is, it must have been intended by the parties to contain the whole agreement, . . . and to be a final expression of one or more terms of the agreement."  Tallmadge, 252 Conn. at

503 (internal quotation omitted).  The Connecticut Supreme Court has found that "[t]he general rule of contract law remains that a merger clause . . . is likely to conclude the issue of whether the agreement is completely integrated," which clause in <u>Tallmadge</u> stated: "This Agreement contains the entire and only agreement between the parties and no oral statements or representations or prior written matter not contained in this instrument shall have any force and effect.  This Agreement may only be changed, modified or discharged by an agreement in writing executed by the parties hereto."  <u>Id</u>. at 503-04. <u>Tallmadge</u> listed unequal bargaining power as well as evidence of fraud, duress or mistake as exceptions to this general rule relating to merger clauses.  <u>Id</u>. at 504-05.  "The fundamental question is one of the intent of the parties.  If they intended the writing to be the repository of their final agreement, parol evidence is not admissible.  If, however, it appears that the parties intended to enter into a contemporaneous oral agreement, parol evidence will be permitted to prove such an agreement. . . . The intent is to be sought in the conduct and language of the parties and the surrounding circumstances."  <u>Harris</u>, 142 Conn. at 210-11.

Here, the August Agreement contained a "Complete Agreement" clause, which certainly appears to indicate that the parties intended the August Agreement "to be the repository of their

final agreement," thus rendering evidence of other agreements inadmissible.  Plaintiff's contention that this "Complete Agreement" clause is distinguishable from the merger clause in Tallmadge on the basis that the Complete Agreement clause states "no oral statements or contract promises or understanding not embodied in this writing shall be valid" and is thus limited to previous oral agreements only, is an unreasonably narrow reading of this clause.  First, the clause also states broadly that "this written Agreement . . . constitutes the entire contract between the parties thereto," without qualification; further, the phrase "oral statements or contract promises or understanding" need not be interpreted to be limited to oral statements only, as the term "contract promises or understanding" has a scope broader than, and distinct from, just oral undertakings.

Evidence of the parties' dealings shows that the August Agreement was intended to encapsulate the entire agreement between the parties.  First, as defendant notes, there are inconsistencies between the July Agreement and the August Agreement, as follows:

| July Agmt. [Doc. # 54 Ex. D] | August Agmt. [Doc. # 54 Ex. C] |
|---|---|
| Laverge Property may contain two building lots | Laverge Property may contain single family residence only (Sched. "A"; Farmer Dep. 91) |

| Prohibition on Ingrassia negotiating with Laverge | Prohibition on disclosure of Right of First Refusal to Laverge (Addendum ¶ D.5) (No prohibition on Ingrassia negotiating with Laverge) |
|---|---|
| Shepaug obligation to act in good faith to procure Laverge Property for Ingrassia | Obligation to grant Right of First Refusal to Ingrassia (Addendum ¶ D.4) (No Shepaug obligation to act to procure property for Ingrassia) |
| Reference to "future bridges" | Shepaug obligation to construct bridge (Addendum ¶ D.2.) |

Second, since the August Agreement includes provisions concerning the right of way/easement in favor of the LaVerge Property and extensively details the right of first refusal granted to Ingrassia should Shepaug acquire the LaVerge Property, including the prohibition on Ingrassia from disclosing the fact of the right of first refusal to Ms. LaVerge, any additional limitation on Ingrassia's dealings with LaVerge intended by the parties, e.g., limiting Ingrassia's right to directly negotiate with LaVerge concerning purchase of her property, would naturally have also been included in the August Agreement, most logically in the Addendum with the other provisions relating to the LaVerge Property.  Indeed, Mr. DePecol prepared a list of issues for the August 2, 2003 meeting with the Ingrassias which included "Buyer agrees not to negotiate with LaVerge," 8/2/03 Document at 2, which DePecol and Farmer both testified was discussed at the August 2 meeting, but which provision was not ultimately

18

reflected in the August Agreement (or in the one-page document initialed by DePecol and Mr. Ingrassia after the meeting that contained other terms to which the parties had agreed, see 8/2/03 Handwritten Document).  From this, the only reasonable inference is that the parties discussed such a limitation in their negotiations over the August Agreement and eliminated it as part of their final agreement.

Plaintiff compares this action to Harris v. Clinton, supra, explaining "[i]n Harris, the plaintiff sold a residential lot to the defendant by executing a written bond for a deed.  The defendant, in consideration for a reduction in the price of the lot, agreed orally to remove a stone bluff which was hindering the plaintiff's development of neighboring lots and to use the stone from that bluff in the construction of a house.  The court found it reasonable to infer from these facts an intent to enter into a contemporaneous collateral agreement."  Pl. Opp. at 5. Harris, however, is distinguishable because the undisputed evidence shows that the limitation on Ingrassia negotiating with LaVerge was a condition Shepaug originally sought to impose on Ingrassia's purchase of its property, and was discussed on August 2, but which did not appear in the final August Agreement, leading to the conclusion that the parties did not intend for

that limitation to be effective.[1]

Thus, the Court finds that the August Agreement constituted the "repository of their final agreement," that the August Agreement therefore supplanted the provisions and obligations of the July Agreement, and that had the parties intended for the limitation on Ingrassia negotiating directly with Ms. LaVerge to remain in effect, a provision memorializing that intent would have been included in the August Agreement.

Because the Court finds that the August Agreement supplanted the July Agreement, the latter is not enforceable.  Therefore, defendant's arguments that the July Agreement is invalid as an unlawful restraint of trade and/or that Shepaug cannot enforce that agreement against her because Shepaug violated that agreement are moot, as is defendant's related breach of contract counterclaim.

**IV.  Conclusion**

For the foregoing reasons, defendant's Motion for Summary

---

[1] Plaintiff's observations that defendant did not attend the August closing and did not read the entire August Agreement or personally sign it, and that defendant's attorney was not aware of the July Agreement until November 2004, are of no moment as any provision limiting Ingrassia's right to directly negotiate with LaVerge would have inured to <u>plaintiff's</u> benefit, not defendant's, and thus one would expect defendant and her attorney to be concerned about it only if plaintiff pressed its inclusion in the August Agreement.  But, to the contrary, the evidence indicates that the provision was proposed and discussed at the August 2 meeting, but ultimately was not included in the final agreement.

Judgment [Doc. # 52] is GRANTED.   The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut this 18th day of December, 2006.**